The next case this morning is 522-0006, Jansen et al. v. Santel. Arguing for the appellant, Ellarine Santel, is Wes Gozia. Arguing for the appellees, William and Laverne Jansen, is Christopher Levy. Each side will have 15 minutes for their argument. The appellant will also have five minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Good morning, gentlemen. Good morning, justices. Good morning, justices. If you all are ready to go, Mr. Gozia, you may proceed. Thank you, your honor. Good morning. May it please the court. Wesley Gozia and I represent Ellarine Santel. This particular case is, in my eyes, a unique set of situations that have led us to this event. There was originally a contract purported to have been entered December 19th of 2018 between my client and the Jansens, who were the appellees in this matter. We believe that the circuit court erred when entering the order in this case. First of all, we believe that the contract in and of itself was not a fully formed agreement, primarily based on the fact that the legal description proved the terms of the contract was to be provided at a later date and time. During that proceeding, after the December 19, 2018, a number of things happened, including some surveys being done, some plats being provided. Eventually, a plat was provided that did have a legal description on it, and Mrs. Santel signed it without notarizing. Then, once it was determined that the notarization was necessary, she then scratched out her signatures. There are some disagreements as to why. The appellees argue that Mrs. Santel was just unhappy with the terms and the price of the contract. We believe that, in fact, she was not in agreement with the amounts of land being sold, but there are some differing opinions on that. That's the basis. We believe that the contract was never fully formed because there was never a full agreement on the exact legal description of the land to be sold. The contract itself specifically was written between Ellery and Santel and the Janssens, Bill and Laverne. It was clear throughout the course of the proceedings that this property was owned jointly between Mrs. Santel and her husband, Robert. Robert was not mentioned anywhere in the contract. It was simply a contract between Ellery and the Janssens. You're saying both parties, Mr. and Mrs. Santel, were on the deed to the property? Correct. Throughout the history, the Janssens had been farming this property for a significant period of time. They had always written their lease checks to Mr. Santel, not to Ellery. They always had handshake agreements on the lease. It had been some time, I think 2012 was the last time there was a written lease for the ground. Otherwise, they'd been handshake leases between Robert and the Janssens. Everybody was aware of the ownership of the property. There was between Ellery and Robert jointly. The contract itself never mentioned Robert, never mentioned Ellery as power of attorney for Robert, and never mentioned the guardian of Robert. Just Robert was never mentioned whatsoever in the contract. Judge Steadland, when he entered the order, made an interesting point. He did mention that Ellery Santel was always able to sell her interest in the property. We believe that in the event that this honorable panel does find that a valid contract existed, we believe that the contract itself would have just been solely between Ellery for her half interest in this real estate and the Janssens, which would affect some of the way the order was entered, the damages that were awarded, because the Janssens wouldn't have been entitled to the full amount of the proceeds off of farming if they were only indeed earning a one-half interest in the ground that Ellery Santel was selling. There were some disagreements throughout the course. My client made references that she believed she was selling the real estate for $8,000 an acre, and that there wasn't really a discussion for a sale for $400,000. She also indicated that she believed that she was selling around 50 tillable acres. Now, that would be to the point where 50 tillable acres at $8,000, excuse me, sorry, the land itself. She did believe that she was selling just a half interest in the ground, and there was some confusion about the amount that was being sold. We believe that if the contract itself was valid, the sale would just be for Ellery's half interest. Mr. Santel was alive for at least a year and a half after this litigation began. Mr. Santel was not a party to this litigation. It was just Ellery Santel. There was a significant period of time to try to include Robert Santel's interest before Robert Santel passed. They had police bring up the after acquired title doctrine saying that Ellery eventually, by the end of this circuit court litigation, Mr. Santel had died. Therefore, Ellery owned all the property and had the ability to transfer the entirety of the property pursuant to the contract. However, at the time the contract was entered, Ellery was the only person mentioned on the contract. We believe that even if the contract is found to be valid, requiring Ellery to transfer the full interest in the property that she only had a half interest in on December 18, 2018, and at the time the litigation started and for approximately a year and a half after that, would not be the correct way to deal with that situation. We believe that the contract, if found valid, she should only have to transfer one half interest for the $400,000 contract price. The after acquired property doctrine does use the terms fee simple absolute. At no point in time did the contract that was entered December 19, 2018, make any reference to fee simple absolute. The contract was probably one of the most simple real estate contracts I've ever seen, limited to one page, basically said Ellery and Santel was selling property listed to addresses and legal description to follow $400,000 to Bill and Laverne Jensen. We believe that there was nothing to indicate that she was trying, even purporting to sell a fee simple absolute interest in the entirety of the real estate that was listed. We believe that the contract, if just looking within the four corners of the contract, was simply indicating that Ellery was trying to sell just the interest she owned on December 19, 2018, which would be a one half interest. Otherwise, I stand on the arguments in my brief, but we'll certainly love to entertain any questions you may have. Justice Long, Justice Welch, any questions? No questions. Was this an 80 acre tract or a 50 acre tract? I'm sorry. In its entirety, it was around 72 acres. There's some disagreement on the exact amount of tillable acreage, but my client believed it was around 50 acres tillable. I believe the appellate thought there was closer to 55, 60 acres tillable. And what was the reason for the plot? Because they were selling those two tracts, one with the residents and then the other the land? Yes, they were parceling out the residents because the contract itself did say that Ellery was keeping her residents. So they created a plot to try to come up with a legal description, parceling off the house and separating the remaining land, which was a combination of tillable pasture and timber. Thank you. What was the the intention to sell the 72 acres minus an acre with the house on it, or was it to sell 50 acres of tillable land only? Well, my client's position was she was selling the tillable land. And that's where she was coming up with the per acre prices for the terms of the contract. The December 19, 2018 document itself are not particularly clear on that issue because it just listed two addresses and then separated off the house and the exact legal description to follow, which was later delineated on the plot that came down the road. Is it true that there was nothing in the contract saying tillable land, it just said land? It didn't say tillable, did it? That's a new term that you brought out here. Was that in the contract written tillable? No, there was nothing written in the contract about tillable, timber, anything of that nature. It just listed land. It just said land. Correct. Okay. Any further questions from the panel? No, thank you. Okay. Thank you, Mr. Gozia. You'll have five minutes in rebuttal. Mr. Levy. Thank you. Morning, Justice. May it please the court. What's important to know about these facts is the timeline in which this happened. Okay. We have a situation where the invited my clients to her home to discuss selling the property with her adult children all present. They all eventually agreed to sign a one-page document posing counsel's correct by far from a great contract, but it is a valid contract nonetheless. Contract specifies that my legal description to come later is because they had to have it surveyed to figure out how many acres comprised what she was retaining, and they did so. That's what created the plat. In order to divide the property this way, they had to subdivide it, and the plat says Robert Santel's first subdivision or something of that nature because they were parceling off 2.1 acres of property that she was going to keep. My clients were buying the remainder. It includes tillable acreage. It includes some swampland. It includes a little pasture acreage for cattle, and that's what was exactly reflected in the plat. At the time Ellarine signed the contract, the initial contract in December of 2018, the reason her husband's name wasn't listed there is because he was in a hospital diagnosed with Alzheimer's, and we heard testimony from the defendant and her son that they did never contemplate having him present because I think the quote was he doesn't know what date it is something to that effect during their testing. My clients had written lease checks when they were leasing this farm to Ellarine Santel when Robert had to be made a resident of a nursing. She admitted she never even contemplated having him. Nobody ever looked at this one-page contract and said, wait a minute, where's my husband's name on here? Where's my father's name? After that, when Ellarine, after the contract was signed, she allowed my clients to go onto the land, clean out brush, remove a fence. She let them have the property surveyed. She cashed a $10,000 down payment check. She asked for another down payment check because she was frustrated the did that mean what was left? How did they figure the 71 acres it ended up? No, it actually overall was 76 acres minus 2.1. 76 acres. Okay. So they didn't agree to, or did they agree to pay $8,000 an acre for the whole? They didn't. And this is where the timeline, I'm sorry. What was the agreement price for the swamp timber and land and the rest of the land that wasn't cultivated? It wasn't tilled. That was not separated off. They were buying everything. They didn't even figure anything in that contract. Apologize, Your Honor. So the amount of some 8,000 an acre was only for the tillable. And then what was for the other? Your Honor, there was never an $8,000 an acre agreement. My client repeatedly argued against that because what that amounts to is well over what this property was appraised for. That amounts to 600 and something thousand dollars when the property appraised for 438. Then you have to subtract the value of the 2.1 acres she's keeping for her house. The agreement here was for $400 for everything but that 2.1 acres. And actually, if I can jump back to the timeline really quick the first time my clients were told she was not going to honor the contract is after she signed the plat, after she reviewed the plat, saw it was 2.1 acres, after she signed her husband's name to the plat. Did she have a written power of attorney for her husband? Not until a month later. But he had L signs. Exactly. Now I won't get into... Did he have the power to sign that power of attorney? That is a great question and I don't know. But the bottom line is she got his power of attorney basically as a means of trying to prove that she didn't have it previously when she signed his name as a way of trying to avoid the contract. But actually she didn't have his power of attorney when she signed it? She did not but she has had his she has signed his name on checks and other why have power of attorney? If you sign a couple checks why have power of attorney? Exactly. Does the power of attorney mean anything? They were trying to use that as a means of voiding the contract because at this point they had already gotten advice from... So let's assume you're assuming then that because she signed some checks she had a power of attorney unwritten. Is that what you're trying to say? That's what my clients believed. And again my clients were there signing his contract and the defendants here never said anything about having Robert Santel present because everybody knew he was in a nursing home with because she represented that she could sign his name. And now that's give her the power to do that? I think it was because she was trying to show that she previously didn't have. She testified she never had a power of attorney even though she had represented numerous times to my clients that she did. So they didn't have any reason to second-guess this since he wasn't there and they knew he had Alzheimer's in the nursing home and she had signed his name on other documents before. But the interesting thing here as well is the first reason they tried to void this contract is because she says I did not have his power of attorney and no authority to sign his name. Then this $8,000 an acre argument didn't show up until April of 2020 which is well after this litigation start. That was not mentioned anywhere in any pleadings. It didn't come out until testimony. And then the argument that she thought she was only selling 50 acres is just her doing $400,000 backwards at $8,000 an acre is 50 acres. That argument didn't come out until right before we had a motion for offensive summary judgment argued. And actually that argument didn't come out until they provided an affidavit five minutes into that argument stating that she said I was only selling 50 acres. And that was a year after, two years after she got the power of attorney in April of 21. So there are these revolving arguments about why this contract is invalid and it all started with the signature issue. Then they started arguing the contract was vague as to price and to acreage and it's not because we've got the price on the contract and we've got the acreage on the plat and she voluntarily signed both and she testified that for months she was happy with the contract. Now then at trial her son testified it was the day they signed the contract in December of 2018 that they realized there was something wrong with it. So why would they continue if they were unaware or there was something wrong with the signing further documentation and signing her husband's name in agreement with the contract. She testified she was happy but you know but it was not until later in at the end of March itself when it was a family member of hers who by the way is a land appraiser or was a land appraiser told her she could have gotten more than she signed she agreed to sell this contract or she agreed to sell the property. That's when she decided to try and void the contract and you said that she held up to them that she had power of attorney but on the contract for sale of land she did not sign Robert's name. She didn't sign Ellarine Sintel and Robert Sintel by Ellarine. She just it was just between Ellarine and your clients the Janssens. So there there was no even representation that she had power of attorney or should not have put them on notice that they're missing a necessary party to this not when they suspected he didn't have the capabilities of signing a contract who was he's still an owner somebody has to represent him as the owner either by power of attorney or by guardianship. Sure and there was never a guardianship appointed okay there was never a guardianship open for him okay. They testified the defendants testified that they didn't think he had any reason to be there because because of his dementia. There was never a guardianship appointed you know unfortunately these two folks these two parties entered this contract they had been lifelong friends my clients had farmed their property on their leases for a long time. They didn't actually ever expect this to become an issue but I think the fact that not only was Robert Sintel incapacitated during this entire process at this point she had been representing that she could represent his interests and because she owned it as a joint tenant with the right of survivorship now that he's passed away she's got sole title. So that's where the doctrine of after acquired title would come in if it doesn't come in at the time she got his power of attorney a month after she signed his name on these documents. One question I have is who was the drafter of the document? Contract? Yes. It was something that parties printed off the internet and filled out together. You said the party so she was involved in that printing that up or did the buyer alleged buyer come over and print that out? My clients printed it off the internet but then they all sat down and filled it out together with her adult children. It's a one page very simple document. But the drafter of the document was the buyer is that correct? No it was a blank document that had to be filled out with the details and both parties sat and did that. So tillable land was put down as one of the details? No it is not. Just the whole apart? The whole it's got two addresses on it and it says excludes Bellarine's house. And it was for the mass the addresses that are included there are all of the acreage the defendants own. So that's why it was it was filled out that way. It's very clear what was being sold here because they were having to they had to have it obviously subdivided. But they didn't know neither party knew what the acreage was until they saw the plat. And both parties voluntarily signed it. Mrs. Chantel obviously voluntarily signed it. She testified she reviewed it first. She testified she her you know adult son was there reviewing the plat with her and she signed both names to it hers and her husband's and returned it unnotarized. But the acceptance of the contract comes in when she signed those names to that plat because that is the legal description that was to follow. Some issue has been made about the failure to have Ellarine's signature notarized on the plat. I'm not aware of any requirement that a is there any provision that a real estate sales contract has to be notarized? And I know that the plat act required some notarization but is that necessary to make a binding real estate contract? No it's not because it doesn't have to be notarized to be acceptance of the contract. And that notarization provision in the plat act only applies to school district issues. For the recording of the plat to show that the seller knows what school district will apply to the property they are selling. It's not required for acceptance of a contract. I'm sorry it's more of a recording issue instead of a contract issue. Yes. But to just quickly summarize here, they've had a revolving door of arguments trying to invalidate this because as you can tell or as you probably could guess, there's a lot of animosity between these parties. Even when my clients would be out there farming under a valid lease which they had to go to court to actually enjoy, they're being video recorded and things like that by the defendant. So they don't like each other at this point. Let me ask you this, if the trial court's finding this as a valid contract is affirmed, you've also asked for damages for loss of farming income. Is that issue really even ripe at this point? Is that something that could not be raised later? Or is that something to remand back even if we affirm we ran back for damages? We'd like to get further damages because the longer this litigation has gone on, the more years my clients can't farm and profit from the property. But we don't have any evidence before the appellate court. How would we make that determination? Is that something that would come later or is that something we should remand for the trial court to determine? I think we could remand it to the trial court to determine that because he's already granted two years worth of lost profits based on insurance documentation and several other exhibits that were entered in the trial court. Thank you. Mr. Levy, I see our time is up. Your time is up, I should say. Does the panel have any other questions for Mr. Levy? No other questions, thank you. Okay, thank you for your argument. Mr. Gozia, you have five minutes in rebuttal. Thank you, Your Honor. Going back to the initial drafting of the contract, the Janssens that were the ones who printed this contract out online, they brought the contract over to Mrs. Santel's residence and the Janssens filled it out in the presence of Ellarine. The only thing that the Ellarine... Was it Ellarine and her adult children were present at the house, not in the room where the contract was signed. It's not a very large house, but there's a kitchen separated where Ellarine was at the table with the Janssens and her children were in the living room that's next to the kitchen. They were all part of the discussion as far as what the testimony is? There's some disagreement as to how much discussion Ellarine's children were involved in, but they were all present at the house. Does her cashing of the deposit, the $10,000 deposit, does that not put her in an awkward position to try and claim we didn't have a contract? Well, to a certain extent, yes. However, at that point in time, they really had no specific agreement on a legal description and they were awaiting a plat for that. We don't believe that her cashing the check completely invalidates that because I think everybody would agree at that particular point in time, there was no full agreement on the exact amount of land until the plat was prepared. There's a lot of reference to this appraisal that the Janssens had done I would point out that I think appraisal is not an appropriate term for the document. It was an estimate from the bank as to what they would finance. There's no appraisal appraiser license number or anything of that mentioned on this document. I think it's more of an estimated value by the bank and not so much a formalized appraisal. The Janssens were the ones who brought the contract over. It's clear to everybody that Robert Santel and Ellarine Santel were joint owners of the property. Whether Ellarine brought it up or the Janssens brought it up, the Janssens should have known that Robert Santel is an owner of the property. The Janssens should have known that Mr. Santel's name needed to be referenced on the contract. The Janssens during questioning and trial did indicate that they've never done a real involved in this that are a little different than outside the norm. But we fully believe that at a minimum that the contract itself on December 19, 2018 if found valid can only be found to be valid between Ellarine for her one half interest and the Janssens. Robert was not mentioned. There's no mention of fee simple absolute in the contract or anything that would be analogous to that term in the term of the contract. So we don't believe that the after acquired property doctrine would even apply in that situation. Ellarine owned one half interest on December 19, 2018 and for a significant period of time after that until Robert died in early 2021. So there's no mention of Robert in the actual pleadings trying to bring Robert, his estate, his power of attorney, anything of that nature involved in this. It was simply a contract between Ellarine Santel and the Janssens. Okay. Thank you. Thank you. This is Welch. Justice Vaughn, any questions? No questions. No questions. Thank you. All right. Thank you gentlemen for your arguments today. We will take this matter under consideration and issue a ruling in due course. You guys have a great rest of your day.